IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION

# CAPITAL CASE

STACEY EUGENE JOHNSON                                                                    PETITIONER

v.                                                No. 5:06CV00185 JLH

LARRY NORRIS, Director,
Arkansas Department of Correction                                           RESPONDENT

## OPINION

Stacey Eugene Johnson was convicted of capital murder and sentenced to death. He petitions this Court for a writ of habeas corpus.

### I. STATEMENT OF FACTS

The body of Carol Heath was discovered in her living room at approximately 6:45 on the morning of April 2, 1993, at her residence in DeQueen, Arkansas. Her throat had been cut to the bone and one-fourth of an inch into the spine. The strap muscles on both sides of her neck were completely severed. The trachea was cut to the carotid arteries and jugular veins were cut on both the left and the right sides. There was evidence of strangulation. Heath had suffered abrasions, contusions, or cuts on her right ear, both cheeks, the bridge of her nose, her lips, her mandible, her left eyebrow, and her forehead. The injuries to her head were blunt force injuries. Her tongue had bite marks that would have been caused during the strangulation or during the blunt force injuries. Heath had suffered abrasions, contusions, and cuts to her arms and legs, as though she had tried to defend herself in a fight. Both breasts had bite marks. A small tear was found in the vaginal area, which could have been caused by insertion of a foreign object or intercourse.[1] The body was naked except for a tee shirt that had been formed into a wad and placed over her throat. A condom

---

[1] The description of Heath's injuries stated above is taken from the testimony of Dr. Frank Joseph Peretti, who performed the autopsy.

package was found in the bathroom, along with a douche bottle.  A puddle of clear liquid was found on the floor around the vaginal area of Heath's body.

On the morning of April 2, Rose Cassady, who was a friend of Heath and whose brother was married to Heath's sister, found Heath's body.  Cassady screamed, went across the street to call the police, and returned to see whether Heath's children, six-year-old Ashley and two-year-old Jonathan, were home.  The children were in the bedroom looking out the window when Cassady returned.  When the police arrived, they removed the children through the window rather than carrying them through the living room where their mother's body was lying.  Ashley told Cassady, "a black man broke in last night."

A few hours later, Ashley was interviewed by an investigator from the Arkansas State Police, Hayes McWhirter.  Ashley told McWhirter that she and her mother had been on the couch when someone knocked on the door.  The person who knocked on the door was a black male who used "a girl sounding name."  Ashley told McWhirter that the black male had on "a black hat with something hanging down the back"; he had a green shirt and sweater; he said that he had just got out of jail; and he was mad at Ashley's mother for dating Branson Ramsey.[2]  Ashley also told McWhirter that she saw her mother and this black male fighting.  She said that she saw the black male with a knife beside her mother while her mother was on the floor bleeding.

After this initial statement, McWhirter showed Ashley a photo line-up consisting of photographs of seven black males.  Ashley picked Johnson out of the photo line-up twice.

Johnson had been living in Albuquerque, New Mexico.  He came to DeQueen, Arkansas, in January 1993 to attend his father's funeral.  He remained in DeQueen after the funeral and made the

---

[2] Branson Ramsey was a white male who had dated Heath.  He was the proprietor of an establishment named "In Your Ear," a place where teenagers and young adults would socialize.

acquaintance of Branson Ramsey. On one occasion he went with Ramsey to Heath's apartment to attend a party and remained after Ramsey had left. According to the testimony of Shawnda Flowers Helms, Johnson asked her and Heath if they would transport drugs for him and if they would date him. They refused and told him that they did not date black men. Later, at In Your Ear, Johnson again asked them to transport drugs for him and to date him. They again refused. According to Helms, Johnson appeared to be angry at their refusal on both of those occasions.

While he was in DeQueen, Johnson was arrested and charged with being a felon in possession of a firearm. He was incarcerated in the Sevier County Jail. While he was incarcerated, he had a conversation with Bobby Ray Wilkinson, another inmate who was acquainted with Heath. Johnson told Wilkinson that he had "f***ed [Carol Heath] a time or two." Wilkinson did not believe Johnson, so he asked Johnson to describe the inside of her apartment, which Johnson did. Wilkinson testified that Johnson "said that he was going to go see her and he was going to f*** her again when he got out."

On April 1, 1993, Johnson's girlfriend wired money from Albuquerque to DeQueen to pay for his bail bond. He was released from the county jail at 2:00 p.m. on April 1. He was the only black male released from the Sevier County Jail between March 14, 1993, and April 2, 1993, when Heath's body was found.

After his release, Johnson went to his stepmother's home. She told him that he could not stay there. Johnson asked his stepmother for a tee shirt, and she gave him a tee shirt that had belonged to his father. He left for a while in the evening, came back, and told her that he had found a place to stay with a white girl who had two little kids and worked at the bank.[3] He then left

---

[3] Heath did not work at the bank.

wearing black jeans, a black "do rag" or something of that sort on his head, a turquoise or green shirt, and a jacket.

On April 5, 1993, a local citizen found Heath's purse at a roadside park between DeQueen and Horatio. He did not recognize the name in the purse, but his wife did, so he called the sheriff's department and went back to the roadside park with a police investigator, who found a green pullover shirt, a white tee shirt, a towel, and some other articles of clothing. Johnson's stepmother testified that the white tee shirt and the green shirt looked like the ones that she had given Johnson. A partially smoked cigarette was found in the pocket of the shirt.

Johnson was arrested in Albuquerque on April 14, 1993, following a traffic stop. He first gave a false identification and used a Jamaican accent. After it became apparent that the identification was false, Johnson was placed under arrest. According to an officer who participated in the arrest, Johnson offered the officers $5,000 each if they would let him go. Johnson told the officers that he had killed somebody in Arkansas and, if he were sent back to Arkansas, they would kill him.

Hair that appeared to come from an African-American was found in Heath's apartment. Testing showed that the DNA in the hair was consistent with Johnson's DNA. The initial testing concluded that the DNA pattern would occur with a frequency of 1 in every 250 African-Americans. The hair and other items were retested over the years as DNA testing became increasingly more precise. At the second trial, the testimony established that the DNA pattern found on the hair would occur among 1 in every 720 million African-Americans. Saliva on the partially smoked cigarette found in the pocket of the shirt at the roadside park also was consistent with Stacey Johnson's DNA. The statistical frequency of the DNA pattern on the saliva on the cigarette butt was approximately 1 in every 28 million African-Americans. The green shirt found at the roadside park had blood the

DNA of which was consistent with Heath's DNA.  The frequency with which that DNA pattern would appear is approximately 1 in 380 million Caucasians, 1 in 6.4 billion African-Americans, and 1 in 390 million Western Hispanics.

## II.  THE PROCEDURAL HISTORY

Johnson's first trial was conducted in DeQueen, the county seat of Sevier County, in September 1994.  Ashley Heath was seven years old at that time.  The court conducted a hearing to determine whether she was competent to testify, but when no one could coax her into the courtroom during the hearing, the judge ruled that she was not competent.  The court permitted McWhirter to read her statement to the jury and to testify that she had identified Johnson in the photo line-up.  Johnson was convicted of capital murder and sentenced to death.  On appeal, the Supreme Court of Arkansas held, among other things, that Ashley's statement to McWhirter was an excited utterance that was properly admitted into evidence as an exception to the hearsay rule and that permitting the introduction of that statement did not violate the Confrontation Clause.  However, the court held that the identification in the photo line-up was not an excited utterance and should not have been admitted.  Because it was error to allow McWhirter to testify that Ashley identified Johnson in the photo line-up when Ashley did not testify, the court reversed for a new trial.  *Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996) ("*Johnson I*").

On remand, Johnson moved for a change of venue due to the extensive publicity that had surrounded his first trial.  He requested that the trial be moved to Little River County.  The trial judge granted the motion for a change of venue but moved the trial to Pike County, rather than to Little River County.  Johnson objected to moving the trial to Pike County because black persons form a much smaller percentage of the population in that county.

By the time of the second trial, Ashley was ten years old. She took the stand during a competency hearing, was found to be competent to testify, and then testified at the trial. McWhirter again read her statement to the jury and again told the jury that she identified Johnson in the photo line-up. Johnson was again convicted and again sentenced to death. The Supreme Court of Arkansas affirmed. *Johnson v. State*, 342 Ark. 186, 27 S.W.3d 405 (2000) ("*Johnson II*").

After the supreme court affirmed on direct appeal, Johnson filed a timely motion for post-conviction relief pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure. Johnson also filed a motion for new testing and retesting of DNA evidence pursuant to Act 1780 of 2001, which is codified at Ark. Code Ann. §§ 16-112-201 to -207. The trial court denied the motion for testing and retesting of DNA evidence, as well as the petition for post-conviction relief. The Supreme Court of Arkansas affirmed in part and reversed in part. *Johnson v. State*, 356 Ark. 534, 157 S.W.3d 151 (2004) ("*Johnson III*"). The supreme court reversed with respect to the denial of retesting on the apparently African-American hair found on Heath's body but affirmed on all other points.

On remand, the trial court held that the hair had already been retested and therefore refused to order additional retesting. On appeal, the supreme court affirmed, noting that it had overlooked the fact that the retesting had already occurred when it wrote the opinion in *Johnson III*. *Johnson v. State*, 366 Ark. 390, __ S.W.3d __, 2006 WL 1349052 (May 18, 2006) ("*Johnson IV*").

Having exhausted his remedies in state court, Johnson now petitions this Court for a writ of habeas corpus. He has raised the following claims for relief:

1.   Johnson's rights under the Sixth and Fourteenth Amendments – his right to present a defense and his right of access to exculpatory evidence – consisting of his rights of due process, compulsory process and confrontation – were violated by the decision to deprive him of access to significant evidence impeaching the child witness.

2.   Johnson's Sixth Amendment right to effective assistance of counsel was violated by failure to properly object to introduction of an oral confession

and which also included supposed admissions to other homicides and drugs. The inclusion of this material also violated his Fifth and Fourteenth Amendment rights.

3.      Johnson's right of confrontation was violated by the admission of out of court statements by Ashley Heath and ineffectiveness of counsel in failing to properly argue the point.

4.      Johnson's right to present a defense was violated by the denial of the right to present inculpatory evidence about an alternative suspect known to have had a close relationship with the deceased.  In the event there is deemed a failure to properly present, this was an instance of ineffective counsel.

5.      Johnson's right to present a defense was violated by denial of access to records involving the deceased and by trial counsel's ineffectiveness in failing to seek the records.  Johnson is entitled to access to the records in order to pursue the claim.

6.      Johnson's rights under the Sixth, Eighth, and Fourteenth Amendments were violated by Arkansas's refusal to permit DNA testing.

7.      The introduction of victim impact evidence, when the Arkansas statute went into effect after the homicide in question, violated the constitutional prohibition against *ex post facto* legislation.

8.      The use of the aggravating circumstance of cruel and depraved violated the Eighth Amendment.

9.      Johnson received an unfair trial, in violation of the Sixth Amendment cross-section requirement and Fourteenth Amendment due process requirements, by the court sending the trial to Pike County, instead of Little River County.

10.     The introduction of victim impact evidence violated Johnson's Eighth and Fourteenth Amendment rights.

11.     The victim impact statute violates the Sixth Amendment right to a jury trial because the jury is not required to make a finding concerning victim impact.

### III.  THE AUTHORITY OF THIS COURT IN ITS REVIEW OF JOHNSON'S CASE

Section 2254 of Title 28 of the U.S. Code permits a prisoner in state custody to petition a

federal court for a writ of habeas corpus "only on the ground that he is in custody in violation of the

Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (2000). Section

2254(d)(1) provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>      (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States . . . .

The Supreme Court explained in *Williams v. Taylor* that to obtain federal habeas relief, a petitioner

must first demonstrate that his case satisfies the condition set by § 2254(d)(1):

> [Section] 2254(d)(1) places a new constraint on the power of a federal habeas court
> to grant a state prisoner's application for a writ of habeas corpus with respect to
> claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may
> issue only if one of the following two conditions is satisfied—the state-court
> adjudication resulted in a decision that (1) "was contrary to . . . clearly established
> Federal law, as determined by the Supreme Court of the United States," or (2)
> "involved an unreasonable application of . . . clearly established Federal law, as
> determined by the Supreme Court of the United States." Under the "contrary to"
> clause, a federal habeas court may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a question of law or if the state
> court decides a case differently than this Court has on a set of materially
> indistinguishable facts. Under the "unreasonable application" clause, a federal
> habeas court may grant the writ if the state court identifies the correct governing
> legal principle from this Court's decisions but unreasonably applies that principle to
> the facts of the prisoner's case.

529 U.S. 362, 412-13, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000). The purpose of § 2254(d)

as amended by the Antiterrorism and Effective Death Penalty Act of 1996 is to limit the scope of

federal court review "in order to effect the intent of Congress to expedite habeas proceedings with

appropriate deference to state court determinations." *Whitmore v. Kemna*, 213 F.3d 431, 433 (8th

Cir. 2000).

A state-court "decision will be viewed as 'contrary to' clearly established federal law if the

state court has applied a rule that directly contradicts Supreme Court precedent or has reached a

result opposite to a result reached by the Supreme Court on 'materially indistinguishable' facts."
*Kinder v. Bowersox*, 272 F.3d 532, 537-38 (8th Cir. 2001).  A state-court decision unreasonably applies clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Williams*, 529 U.S. at 413, 120 S. Ct. at 1523.  "Stated simply, a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id*. at 409, 120 S. Ct. at 1521.  "[W]e must remember that unreasonable is not the same as incorrect."  *Kinder*, 272 F.3d at 538 (citing *Penry v. Johnson*, 532 U.S. 782, 793, 121 S. Ct. 1910, 1918, 150 L. Ed. 2d 9 (2001)).  "The state court's application might be erroneous, in our 'independent judgment,' yet not 'unreasonable.'"  *Id*. (quoting *Williams*, 529 U.S. at 411, 120 S. Ct. at 1522).

A habeas petitioner may also seek relief on the ground that the state court made an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  The state court's findings of fact are presumed to be correct.  *Id*. at § 2254(e)(1).  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.  *Id*.

Before bringing his claims to this Court, a petitioner must have presented his claims in state court.  *Baldwin v. Reese*, 541 U.S. 27, 29, 124 S. Ct. 1347, 1349, 158 L. Ed. 2d 64 (2004).  The Eighth Circuit has explained:

> "A prisoner seeking a writ of habeas corpus from a federal court must first fairly present his claims to the state courts in order to meet the exhaustion requirement of 28 U.S.C. § 2254(b)."  We have held repeatedly that a claim has not been fairly presented to the state courts unless the same factual grounds and legal theories asserted in the prisoner's federal habeas petition have been properly raised in the prisoner's state court proceedings. We have also held that a claim is considered exhausted "when the petitioner has afforded the highest state court a fair opportunity to rule on the factual and theoretical substance of his claim."

*Krimmel v. Hopkins*, 56 F.3d 873, 875-76 (8th Cir. 1995) (citing *Forest v. Delo*, 52 F.3d 716, 719 (8th Cir. 1995); *Keithley v. Hopkins*, 43 F.3d 1216, 1217 (8th Cir. 1995); *Ashker v. Leapley*, 5 F.3d 1178, 1179 (8th Cir. 1993)) (citations omitted). "In order to fairly present a federal claim to the state courts, the petitioner must have referred to '"a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue" in a claim before the state courts.'" *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997) (quoting *Myre v. Iowa*, 53 F.3d 199, 200-01 (8th Cir. 1995) (quoting *Kelly v. Trickey*, 844 F.2d 557, 558 (8th Cir. 1988))).

Even when a petitioner has met the exhaustion requirement, federal law may prevent a federal court from considering the federal habeas claim if it has been procedurally defaulted. "[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 732, 111 S. Ct. 2546, 2555, 115 L. Ed. 2d 640 (1991). A state court procedural default can occur at any level of state-court review: at trial, on direct appeal, or in the course of state post-conviction proceedings. *Kilmartin v. Kemna*, 253 F.3d 1087, 1088 (8th Cir. 2001). Another judge of this Court has explained:

> A petitioner's claim may also be procedurally defaulted for failure to present the claim to the state courts entirely. "[W]here a federal habeas petitioner raises a claim which has *never* been presented in any state forum, a federal court may properly determine whether the claim has been procedurally defaulted under state law, such that a remedy in state court is unavailable . . . ." *Harris v. Reed*, 489 U.S. 255, 268-270, 109 S. Ct. 1038, 103 L. Ed. 2d 308 (1989) (O'Connor, J., concurring); 28 U.S.C. § 2254(c). In other words, if the petitioner "failed to exhaust state remedies and the [state] court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred[,]" for purposes of federal habeas review, the petitioner's claim is considered procedurally defaulted. *Coleman*, 501 U.S. at 735 n.1, 111 S. Ct. 2546. Here, too, the federal court cannot consider the petitioner's claim unless the petitioner can "excuse" the procedural default.

A petitioner can "excuse" the procedural default of his claims in state court, and obtain federal habeas review of those claims, only if the petitioner can demonstrate either: (1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice, such as the conviction of one who is actually innocent. [*Murray v. Hvass*, 269 F.3d 896, 898 (8th Cir. 2001)]; *Fann v. Bowersox*, 247 F.3d 841, 843 (8th Cir. 2001). "Cause" for the procedural default exists, for example, when counsel has been constitutionally ineffective or when an objective, external impediment prevented counsel from complying with the state's procedural rule. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986). To demonstrate prejudice, a petitioner must show "not merely that the errors at trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions . . . [such that he] was denied fundamental fairness at trial." *Murray*, 477 U.S. at 494, 106 S. Ct. 2639 (internal quotation and punctuation omitted).

*Noel v. Norris*, 194 F. Supp. 2d 893, 903-04 (E.D. Ark. 2002).

## IV. APPLICATION OF THE LAW TO THE PRESENT CASE

**Claim No. 1: Johnson's rights under the Sixth and Fourteenth Amendments – his right to present a defense, his right of access to exculpatory evidence, and his rights to due process, compulsory process, and confrontation – were violated by the decision to deprive him of access to significant evidence impeaching the child witness**.

Johnson first argues that at his second trial he was deprived of access to significant evidence impeaching the testimony and credibility of Ashley Heath. He contends that the alleged deprivation violated his right to compulsory process, his right to confront witnesses against him, and his right to due process of law under the Sixth and Fourteenth Amendments.

As noted above, Johnson was first tried for the murder of Carol Heath in 1994. A hearing was conducted before trial to determine whether Ashley, who was then seven years old, was competent to testify. The trial court appointed an attorney ad litem to represent Ashley's interests. The attorney ad litem waived the psychotherapist/patient privilege available under Rule 503 of the Arkansas Rules of Evidence. The judge ruled that Ashley was incompetent to testify. The determination of incompetency was made in part upon the testimony of Dr. Carnelle Barnes, the

psychologist who had seen Ashley following the murder of her mother, and in part on the fact that Ashley could not be coaxed into the courtroom for the hearing.

After the first conviction was reversed on appeal, Johnson was tried again in 1997. Ashley was ten years old. Ashley appeared and was interrogated at a competency hearing. The trial judge found her to be competent to testify, and she did so at trial. Hayes McWhirter again read to the jury the statement that Ashley had given to him on the afternoon after her mother had been murdered because the supreme court had previously ruled that the statement was an excited utterance and admissible under Rule 803(2) of the Arkansas Rules of Evidence. *See Johnson I*, 326 Ark. at 441-44, 934 S.W.2d at 184-86. Between 1994 and 1997, Ashley had seen another psychotherapist. This time, the psychotherapist privilege was not waived, and the trial court denied access to the records of the second psychotherapist.

On appeal, the Supreme Court of Arkansas held that the records of the second psychotherapist were privileged under Rule 503 of the Arkansas Rules of Evidence. *Johnson II*, 342 Ark. at 194-98, 27 S.W.3d at 411-13. The court also held that waiver of the privilege with respect to the records of the first psychotherapist did not result in a waiver of the privilege with respect to the second psychotherapist. *Id*. at 195-96, 27 S.W.3d at 411-12 (citing *Maryland Cas. Co. v. Maloney*, 119 Ark. 434, 178 S.W. 387 (1915)). The court further held that protecting the privileged material did not violate Johnson's constitutional right to present his defense. *Id*. at 196-97, 27 S.W.3d at 412 (citing *Jaffee v. Redmond*, 518 U.S. 1, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996) (recognizing a federal psychotherapist/patient privilege under Rule 501 of the Federal Rules of Evidence)). In addition, the court held that the psychotherapy records were not discoverable under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), because there was

no showing that the State had had access to the records. *Johnson II*, 342 Ark. at 197-98, 27 S.W.3d at 412-13.

The holding of the Supreme Court of Arkansas was not clearly contrary to, nor an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. Although Johnson cites numerous decisions of the Supreme Court of the United States in the section of his brief addressing this issue, none of those decisions presented a factual situation similar to this case.

In *Newton v. Kemna*, the Eighth Circuit held that the Confrontation Clause was not violated by a state court's refusal to provide access to the psychiatric records of a key witness for use in cross-examining her. 354 F.3d 776, 779-82 (8th Cir. 2004). The Eighth Circuit stated, "[The petitioner] has not identified any clearly established Supreme Court precedent requiring that a defendant have access to a witness's psychiatric records for impeachment purposes." *Id*. at 781. The Eighth Circuit explained:

> We recognize that one goal of effective cross-examination is to impeach the credibility of opposing witnesses. The Supreme Court has observed that "the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness," [*Davis v. Alaska*, 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1924)]. Mr. Newton, however, has had ample opportunity to cross-examine and impeach the character and testimony of Ms. Ennis. The trial court's decisions to preclude Mr. Newton from obtaining access to Ms. Ennis's psychiatric records and from cross-examining her about post-offense issues were apparently based on the legitimate state interests of avoiding irrelevant testimony and jury confusion, and protecting Ms. Ennis's assertion of her physician-patient privilege. The Supreme Court has emphasized that "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (per curiam) (emphasis in original). Thus, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431,

89 L. Ed. 2d 674 (1986).  We agree with the district court that the Missouri courts'
restriction of the scope of Mr. Newton's cross-examination of Ms. Ennis does not
merit federal habeas relief under the standards set forth in § 2254, and we hold that
the state courts' adjudication of his confrontation clause claim was neither contrary
to, nor did it involve an unreasonable application of, clearly established Supreme
Court precedent.

*Id*. at 781.  Here, as in *Newton*, Johnson has not identified any Supreme Court precedent requiring

that a defendant have access to a witness's psychiatric records for impeachment purposes.

Johnson's argument on this point is inconsistent with *Newton*, a precedent that is binding on this

Court.  Therefore, Johnson's petition for writ of habeas corpus is denied as to his first claim.

**Claim No. 2:  Johnson's Sixth Amendment right to effective assistance of
counsel was violated by failure to properly object to the introduction of an oral
confession, which also included supposed admissions to other homicides and
drugs.  The inclusion of this material also violated his Fifth and Fourteenth
Amendment rights**.

Johnson was arrested in Albuquerque, New Mexico, on April 14, 1993.  The officers who

made the arrest were Paul Pacheco and Edward Bylotas.  Pacheco testified as follows:

Officer Bylotas is either by the front of the car doing paperwork or what not or I'm
not real sure.  I think he was there because I was towards the front of the jail.  At that
point he said – after [Johnson] said I'm wanted in Arkansas, I have a warrant, and
I said, "Well, there's lot of people that have warrants.  Why didn't you just tell me
that?"  "Because I killed somebody in Arkansas and if I go back there, they'll kill
me," which is what he said.

Pacheco also testified about another comment by Johnson moments after the one quoted above:

The warrant came up and we confirmed the warrants.  At that point, he's still talking.
He starts talking about some other things.  He starts talking about some homicides
in Arizona and he's talking about drugs and he said I want to talk to you and at that
point, I said, "Just hold on.  If you want to talk to somebody, I'll be more than happy
to let you talk to one of our homicide detectives," because I had been on for quite a
while.  I'm a street officer.  It was not in my realm of expertise, so I basically just
told him just go ahead and I'll get somebody to talk to you, be glad to.  At that point,
we took Mr. Johnson – after we verified everything, we took Mr. Johnson to the
detention center, to the holding area and he was booked.

Johnson argues that his lawyers were ineffective because they had not talked to him about testifying at his suppression hearing; because the decision not to call him at the suppression hearing was affected by the fact that one of his lawyers was not aware of Rule 104(d) of the Arkansas Rules of Evidence, which prohibits cross-examination of the accused on the merits of the case at a preliminary hearing; and because one of the trial lawyers did not consider objecting to Pacheco's testimony regarding other homicides and drug offenses because he thought those comments were so bizarre that allowing Pacheco to repeat them before the jury would cast doubt on Johnson's confession that he had killed somebody in Arkansas.  The Supreme Court of Arkansas addressed these issues as follows:

> In the Rule 37 hearing, trial counsel testified that the suppression issue was litigated at a pretrial hearing despite the lack of a written motion to suppress.  As to the issue of putting Mr. Johnson on the stand, defense counsel testified that the decision not to testify was made by Mr. Johnson after trial counsel explained the situation.  Finally, counsel testified that he believed the statements would be admitted, so it was his strategy to make them appear that they were outrageous ramblings and were not credible.  Matters of trial strategy are not grounds for post-conviction relief.

*Johnson III*, 356 Ark. at 551-52, 157 S.W.2d at 164.

Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  In *Strickland*, the Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687, 104 S. Ct. at 2064.  On the first prong, the Supreme Court explained:

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.  The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.  At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

*Id*. at 690, 104 S. Ct. at 2066.  On the second prong, the Court explained:

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id*. at 694, 104 S. Ct. at 2068.

Johnson cannot meet either prong of the *Strickland* test.  He cannot show that his lawyers made errors so serious that they were not functioning as the counsel guaranteed the defendant by the Sixth Amendment, which is to say that he cannot show that in light of all the circumstances, his lawyers' acts or omissions were outside the wide range of professionally competent assistance; nor can he show that but for the alleged errors it is reasonably probable that the outcome of his trial would have been different.  Johnson's lawyers interviewed the officers before trial, made an oral motion to suppress the confession, and did an adequate job of cross-examining the officers at the suppression hearing.  One of the lawyers representing Johnson was unaware that Johnson could have testified at the suppression hearing without being subjected to cross-examination on other issues, but that lawyer was the junior lawyer on the case and not the lead lawyer.  The lead lawyer for the defense testified at the Rule 37 hearing:

> Q      Back – let's go back to what you said about the defendant testifying.  Back
>        at the hearing concerning the two officers from New Mexico, did you discuss

with Mr. Johnson whether or not he could testify at that hearing concerning knowing Pacheco? Did you have a discussion with him at that time about his right to testify?

A       Yes. When you have something as important as that, but in this particular case, yes. I discussed with him that we were going to have hearings long before - - when we were just filing the motions when I first got into the case, I talked to him about whether he might testify in a particular hearing, some hearings or whether at the trial and, you know, his record and whether he could be impeached on his record because he was in jail on a felony offense. Yeah, we discussed all of that and I explained to him, you know, if the defendant cannot really, really help himself, he should never take the stand because if he can't help himself and he takes the stand, he puts himself subject to cross-examination by the prosecutor. We discussed it.

Q       Okay. In this particular one they're alleging you're ineffective because you failed to put him up there for the limited purpose of testifying to his relationship with Pacheco without regular cross-examination.

A       Okay. Two things. Number one, I read all that information from the first trial about the proffer of evidence. I knew the circumstances, I interviewed the officers, I knew what they were going to testify to and I knew, I knew that this evidence was going to be allowed in. I knew they were going to be allowed to testify from my experience. I knew the Court was going to rule because it was solid. You know, most of the conversations with them, anything that's remotely suppressible would have been when they were in general conversation trying to get him to just identify himself, and then they Mirandized him and all of that, and I talked to the defendant and informed him, you know, now, if you want to take the stand and say these people are liars and this never happened and all this kind of stuff, fine, but remember when you take the stand, if you go to testifying to this and to this, these prosecutors are going to figure out a way a lot of times to get something else in and something else and before long you'll be talking about something you might not want to talk about.

Q       Did you have a concern that he could possibly open some door?

A       Yeah. Yes. Ninety-five percent of the people who take the stand open the door. I mean he made the conscious decision in every time, hearings trial or whatever, to testify or not to testify. I mean he is not unintelligent.

In the face of this testimony, this Court cannot find that the performance of the defense lawyers at

the suppression hearing failed to meet the *Strickland* standard; nor is there any reason to believe that

the result of the suppression hearing would have been different if the defense lawyers had called

17

Johnson or done anything else differently.  The decision of the Supreme Court of Arkansas was not contrary to nor an unreasonable application of federal law as clearly established by the Supreme Court of the United States.

Johnson argues as though Officer Pacheco had testified that he confessed to murdering persons other than Heath.  Pacheco did not testify that Johnson confessed that he had committed murders other than the one in Arkansas, nor that he confessed to other crimes.  Pacheco testified, "He starts talking about some other things.  He starts talking about some homicides in Arizona and he's talking about drugs and he said I want to talk to you . . . ."  If Pacheco had testified that Johnson stated that he had committed other murders and had been involved in drug trafficking, the failure of his attorneys to object likely would meet the first prong of the *Strickland* test.  However, the transcript shows that Pacheco did not testify that Johnson confessed to other murders or that he confessed to drug trafficking.  At no time in opening statement, closing argument, or questioning of other witnesses did the prosecutor ever mention the supposed confession to other crimes.  From a review of the transcript as a whole, it does not appear that this comment by Pacheco ("He starts talking about some homicides in Arizona and he's talking about drugs") had any impact on the trial whatsoever.  Nothing in the record suggests that permitting this testimony was outside the wide range of professional competence of counsel or that it cast doubt on the reliability of the outcome of the trial.  Johnson's petition for writ of habeas corpus is denied as to his second claim.

**Claim No. 3:  Johnson's right of confrontation was violated by the admission of out of court statements by Ashley Heath and ineffectiveness of counsel in failing to properly argue the point**.

As noted above, on the afternoon after Carol Heath was murdered, Ashley Heath was interviewed by Hayes McWhirter of the Arkansas State Police.  McWhirter read to the jury the following as Ashley's statement:

Mother and I were on the couch when someone knocked on the door.  She got up and opened the door.  Mother likes Branson.  He works at In Your Ear Video Center.  The black male asked where Branson was.  The black male used a girl sounding name.  He had on a black hat with something hanging down in the back.  He had on a green shirt and sweater.  When they were talking, the black male said he just got out of jail.  The black – the black male was mad at mother for dating Branson.  He had been over two other times, but it was a long time ago.  The black male had about as much hair as [McWhirter].  I saw them fighting.  Then I saw mother laying on the floor.  I saw the black male leave and he got up and he got in a brown truck, I think.  I saw a knife and a gun.  The brown truck was parked beside the house.  Mother looked out the window when he knocked, and then she let him in.  While mother was laying on the floor, the black male walked to the bathroom.  We were hiding in the closet.  I came out to go to the bathroom and the black male had a knife in his hand standing besides Mama.  She was on the floor bleeding.  After he left, I went in and saw mommy bleeding.  Jonathan looked at mommy twice.  She was covered in blood.  We went to bed.  Then this morning, when someone knocked on the door, I was scared to open the door.  When Rose screamed, I knew she saw mommy with blood all over her.  Every time I saw the black male he had clothes on.

Johnson moved to exclude this statement before the first trial.  The trial court conducted a hearing to determine whether to exclude the statement.  At the hearing, McWhirter testified that he took a social worker, Cynthia Emerson, with him to talk to Ashley at her grandparents' house at approximately 3:30 p.m. on April 2, which was approximately nine hours after Heath's body had been discovered.  The trial court ruled that Ashley's statement and her identification of Johnson in the photo line-up were excited utterances and therefore admissible as an exception to the hearsay rule.  On appeal, the Supreme Court of Arkansas addressed the issues in the context of both the rules of evidence and the Confrontation Clause.  *Johnson I*, 326 Ark. at 438-41, 934 S.W.2d at 182-84.  The supreme court held that Ashley's identification of Johnson in the photo line-up appeared to be "a deliberate and reflective act by the young girl and not . . . conduct we associate with spontaneity, excitement, or impulsiveness."  *Id*. at 440, 934 S.W.2d at 183.  Therefore, the court held, "The testimony by Officer McWhirter of Ashley's selection from the photo lineup should have been excluded as unreliable hearsay and as running contrary to Johnson's right to confront the witnesses against him."  *Id*.

In contrast, the supreme court held that Ashley's statement that McWhirter wrote down and read to the jury was an excited utterance that was admissible as an exception to the hearsay rule and that did not violate the Confrontation Clause. *Id.* at 441-44, 934 S.W.2d at 184-86.  The court said that the factors to consider included the lapse of time between the event and the statement, the fact that the statement was made in response to an inquiry, the age of the declarant, the declarant's mental and physical condition, the characteristics of the event, and the subject matter of the statement. *Id.* at 442-43, 934 S.W.2d at 185 (citing *United States v. Iron Shell*, 633 F.2d 77, 86 (8th Cir. 1980)).  For the excited utterance exception to apply, the court said, it must appear "'that the statement was spontaneous, excited or impulsive rather than the product of reflection and deliberation.'"  *Id.* at 443, 934 S.W.2d at 185 (quoting *Iron Shell*, 633 F.2d at 86).   As the court noted, Emerson testified at the omnibus hearing that Ashley "rattled" to the police officer when telling her story and that it was "very fast pace[d]."  *Id.* at 442, 934 S.W.2d at 184.  As reiterated by the court, Emerson testified:

> [Ashley] was very upset and hyper, but it was like when she was telling us the story, she was just focused in on what was happening.  She wasn't really aware that we were there.  I mean she was telling us this story, but it wasn't a story to her.  It was just something she needed to say.

*Id.*  Similarly, McWhirter testified that Ashley "just unloaded" on him – "she just started talking, spontaneous . . . .  [S]he just kept talking and never stopped . . ., so we just let her keep talking until she finished."  *Id.*  In commenting on this evidence, the court stated, "Thus, you had a six-year-old child who from two reports was hyperactive, scared, and excited when she told about the murder of her mother on the afternoon after the homicide."  *Id.*

The ruling by the Supreme Court of Arkansas in *Johnson I* that McWhirter's reading Ashley's statement fell within an exception to the hearsay rule and did not violate the Confrontation Clause was not clearly contrary to nor an unreasonable application of any federal law that was

clearly established by the Supreme Court of the United States at the time of the *Johnson I* decision. In *Idaho v. Wright*, the Supreme Court held that the Confrontation Clause requires that the prosecutor "'either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant'"; and, "once a witness is shown to be unavailable, 'his statement is admissible only if it bears adequate "indicia of reliability," [which] can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.'"  497 U.S. 805, 814-15, 110 S. Ct. 3139, 3146, 111 L. Ed. 2d 638 (1990) (quoting *Ohio v. Roberts*, 448 U.S. 56, 65-66, 100 S. Ct. 2531, 2538-39, 65 L. Ed. 2d 597 (1980)).  In making its decision, the Supreme Court of Arkansas relied upon *Wright* and followed it appropriately.

Before the second trial, Ashley testified at a competency hearing at which Johnson's lawyers had the opportunity to cross-examine her.  She was found to be competent to testify at trial, and she did testify at trial.  She testified that a black man came to the house, stayed for a short time, and came back after she had gone to bed.  She woke in the night and saw this man and her mom pushing each other.  She went back to the bedroom and put her little brother in the closet.  She came out and the man was on top of or leaning over her mom.  She went back to the closet and, later, came out again.  Her mom was "in the living room with blood all over her."  She testified that she remembered the photo line-up and that the man she picked out was the man who was hurting her mom that night.  After Ashley testified, McWhirter again read her statement to the jury and again testified that Ashley had identified Johnson in the photo line-up.

After the decisions in *Johnson I* and *Johnson II*, the United States Supreme Court held: "Testimonial statements of witnesses absent from trial have been admitted only when the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine."  *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369, 158 L. Ed. 2d 177 (2004).  Even

21

if *Crawford* overruled *Wright*, the use of Ashley's out-of-court statement at the second trial did not violate the Confrontation Clause because Ashley was present to testify. "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. . . .   The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Id.* at 59 n.9, 124 S. Ct. at 1369. Ashley testified at the second trial; she was available for cross-examination.

Furthermore, even if the use of Ashley's out-of-court statement was contrary to *Crawford*, this Court could not grant habeas relief. *Crawford* does not apply retroactively; it does not apply to cases in which the conviction became final on direct appeal before the Supreme Court decided *Crawford*. *Whorton v. Bockting*, ___ U.S. ___, ___, 127 S. Ct. 1173, 1181, 167 L. Ed. 2d 1 (2007). Johnson's petition for writ of habeas corpus is denied as to his third claim.

> **Claim No. 4:  Johnson's right to present a defense was violated by the denial of the right to present inculpatory evidence about an alternative suspect known to have had a close relationship with the deceased.  In the event there is deemed a failure to properly present, this was an instance of ineffective counsel**.

Johnson argues that he was denied a fair trial because the trial court excluded the testimony of Cordelia Vinyard, former wife of Branson Ramsey. His petition for a writ of habeas corpus states:

> She testified that indeed her divorce had become final on April 1, 1993, the date of Carol Heath's death, and that in March of 1993 and for four years previously Branson Ramsey had slapped, punched and kicked her and had bitten her on the breast. Johnson argued that the evidence was relevant and necessary for his defense. The trial court sustained the State's objection and refused to permit the testimony in front of the jury. Trial counsel did not phrase his objections in constitutional terms, but rather merely in terms of Arkansas rules of evidence. The Supreme Court obviously affirmed on this point.

> In Rule 37, Johnson argued that trial counsel should [have] framed the issue in constitutional terms involving the right to present a defense and that Johnson would have prevailed had the issue been presented in that format.

As Johnson concedes, the only objection made at trial was made in terms of the Arkansas rules of evidence, and the Supreme Court of Arkansas "obviously affirmed on this point." Although Johnson goes on to argue that counsel should have framed the issue in constitutional terms and would have prevailed had the issue been so framed, the record shows nothing that would meet either prong of the *Strickland* test.  In *Holmes v. South Carolina*, the Court held that no conflict exists between the Constitution and the well-established rules of evidence that authorize trial judges to exclude evidence the probative value of which is outweighed by other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.  547 U.S. 319, ___, 126 S. Ct. 1727, 1732, 164 L. Ed. 2d 503 (2006).  The Court noted, "A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged."  *Id*. at ___, 126 S. Ct. at 1733. The decision of the trial judge to exclude the testimony of Cordelia Vinyard, and the opinion of the Supreme Court of Arkansas upholding that decision, are not clearly contrary to nor an unreasonable application of any federal law clearly established by the United States Supreme Court; nor does the record show that Johnson's lawyers were ineffective in failing to frame the issue in constitutional terms.  Johnson's petition for writ of habeas corpus is denied as to his fourth claim.

> **Claim No. 5: Johnson's right to present a defense was violated by denial of access to records involving the deceased and by trial counsel's ineffectiveness in failing to seek the records.  Johnson is entitled to access to the records in order to pursue the claim**.

Johnson argues that his trial lawyers were ineffective for failing to seek access to counseling records of Carol Heath to discover whether she was afraid of anyone or whether anyone had threatened her, so that forensic evidence could have been tested against that person.  In his Rule 37 proceedings, the trial judge denied access to the records.  On appeal of the denial of his Rule 37

petition, the Supreme Court of Arkansas held that Johnson had abandoned the argument on appeal. *Johnson III*, 356 Ark. at 557-59, 157 S.W.3d at 168-69.

Assuming this Court can reach the merits of this claim despite the fact that the Supreme Court of Arkansas deemed it procedurally defaulted, nothing in this record would permit the issuance of a writ of habeas corpus. Nothing in this record would permit the Court to conclude that trial counsel's failure to seek Carol Heath's counseling records fell below an objective standard of reasonableness, nor is there any evidence from which the Court could find prejudice. Johnson argued that Heath's counseling records "would have disclosed the identity of any person of whom Heath was afraid or who had threatened to harm her." This Court permitted Johnson's lawyers to subpoena those records and file them under seal. They do not disclose the identity of any person of whom Heath was afraid or who had threatened to harm her. Nothing in those records shows that Johnson's defense was prejudiced by the fact that they were not obtained before trial. Johnson's petition for writ of habeas corpus is denied as to his fifth claim.

**Claim No. 6: Johnson's rights under the Sixth, Eighth, and Fourteenth Amendments were violated by Arkansas's refusal to permit DNA testing.**

During the state post-conviction proceedings, Johnson moved for additional DNA testing of the partially smoked cigarette found in the green shirt at the roadside park; hairs that were found in Heath's apartment and that appeared to come from an African-American; and hairs that were found in Heath's apartment and that appeared to come from a Caucasian. Johnson moved for this testing pursuant to Act 1780 of 2001, which is codified at Ark. Code Ann. §§ 16-112-201 to -207. The trial court denied Johnson's motion.

On appeal, the Supreme Court of Arkansas held that "DNA testing of evidence is authorized if testing or retesting can provide materially relevant evidence that will significantly advance the defendant's claim of innocence, in light of all the evidence presented to the jury and the evidence

24

presented to the trial court at the Act 1780 hearing." *Johnson III*, 356 Ark. at 546, 157 S.W.3d at 161. Using this test, the supreme court affirmed the trial court's order not to require retesting of the Caucasian hairs and the cigarette butt but reversed with respect to the retesting of the African-American hairs. *Id.* at 548-51, 157 S.W.3d at 162-64.

With respect to the Caucasian hairs, the court noted that the prosecution stipulated that Johnson, an African-American, was not the source of the Caucasian hairs.

> Therefore, not only were the hairs available for at least some DNA testing, the jury knew there were hairs that belonged to someone other than Johnson and it still convicted him. On these facts, we do not believe that the caucasian hairs are evidence that is "materially relevant to the defendant's assertion of actual innocence" as required by § 16-112-202(c)(1)(B).

*Id.* at 548, 157 S.W.3d at 162.

With respect to the cigarette butt, the court noted that it had already been retested and that, "[f]ar from excluding Mr. Johnson, the probability of the saliva being a donor other than Mr. Johnson went from 1 in 250 to 1 in 28 million, thereby decreasing the probability that the saliva belonged to anyone other than Mr. Johnson." *Id.* at 549, 157 S.W.3d at 162-63. The court held that it was extremely unlikely that retesting the cigarette butt saliva again would rule out Mr. Johnson as the donor of the cigarette butt, and furthermore, the "retesting of evidence every time science advances to include testing for yet another genetic marker . . . is simply not the purpose behind § 16-112-201 *et seq*." *Id.* at 550, 157 S.W.3d at 163.

With respect to the African-American hairs, the supreme court stated, "DNA results on these hairs could not exclude Mr. Johnson, but the probability that they belong to another African-American were only 1 in 250." *Id.* Based on this probability, the supreme court reversed the trial court's denial of retesting with respect to the African-American hairs and remanded for the trial court to conduct such tests.

On remand, the trial court did not order retesting of the African-American hairs but instead entered an order finding that the State had already had the hairs retested in preparation for the second trial in 1997, and that, as a result of the new tests, the DNA profile matched that of Johnson and decreased the likelihood from 1 in 250 to 1 in 720 million that the hairs belonged to an African-American other than Johnson.  Johnson appealed, arguing that the trial court had disregarded the mandate.  The supreme court affirmed and conceded that the earlier decision remanding for retesting of the hairs had been based on a factual error.  *Johnson IV*, 2006 WL 1349052, at *3.

Johnson contends that the denial of access to testing is an unreasonable application of federal law clearly established by the Supreme Court in *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).  He argues that the State failed to comply with its own rules and therefore unreasonably applied federal law clearly established in *Hicks v. Oklahoma*, 447 U.S. 343, 100 S. Ct. 2227, 65 L. Ed. 2d 175 (1980).  He further argues that he should be entitled to develop the factual basis for the claim in federal court pursuant to *Williams v. Taylor*, 529 U.S. 420, 120 S. Ct. 1479, 146 L. Ed. 2d 435 (2000).

None of these arguments has merit.  The Supreme Court of Arkansas did not unreasonably apply any clearly established federal law when it denied Johnson's requests for testing or retesting.  The DNA testing on the saliva found on the cigarette butt and on the African-American hairs found at the crime scene had been tested and retested.  The likelihood that the saliva belonged to anyone other than Johnson is approximately 1 in 28 million.  The likelihood that the hairs belong to an African-American other than Johnson is approximately 1 in 720 million.  Given these statistical odds, it would serve no useful purpose to order retesting of the cigarette butt or the African-American hairs.  With respect to the Caucasian hairs, as the Supreme Court of Arkansas noted, the

prosecution stipulated that those hairs did not belong to Johnson.  The jury knew that they did not belong to Johnson and convicted him anyway.

There is no merit to Johnson's claims that his rights were violated by the refusal of the Supreme Court of Arkansas to order further DNA testing.  Johnson's petition for writ of habeas corpus is denied as to his sixth claim.

> **Claim No. 7:  The introduction of victim impact evidence, when the Arkansas statute went into effect after the homicide in question, violated the constitutional prohibition against *ex post facto* legislation**.

Johnson argues that his right under Article 1, section 10 of the United States Constitution to be free from *ex post facto* legislation was violated by the admission of victim impact evidence because that evidence was inadmissible at the time of the offense.  Carol Heath was murdered on April 1, 1993.  Two weeks later, Act 1089 of 1993, now codified at Ark. Code Ann. § 5-4-602(4), went into effect.  Act 1089 permits the introduction of victim impact evidence in capital sentencing proceedings.

The Eighth Circuit addressed this issue in *Nooner v. Norris*, 402 F.3d 801, 806-07 (8th Cir. 2005).  There, the Eighth Circuit held that the statute authorizing the introduction of victim impact evidence was procedural rather than substantive, and that permitting victim impact evidence in a capital case in which the murder occurred before the statute went into effect did not violate the prohibition on *ex post facto* laws.  Johnson concedes that this Court is bound by the Eighth Circuit decision in *Nooner v. Norris*, even though he argues that *Nooner v. Norris* was erroneously decided and should be overruled.  This Court must follow *Nooner* and deny Johnson's petition on this point. If *Nooner* is to be reversed, either the Eighth Circuit or the Supreme Court will have to do so. Johnson's petition for writ of habeas corpus is denied as to his seventh point.

**Claim No. 8:  The use of the aggravating circumstance of cruel and depraved violated the Eighth Amendment**.

At the penalty phase, the jury was instructed that it could consider as an aggravating circumstance that "the capital murder was committed in an especially cruel or depraved manner." The trial court explained to the jury what it means to commit a capital murder in an especially cruel manner as follows:

> The capital murder is committed in an especially cruel manner when, as a part of a course of conduct, intended to inflict mental anguish, serious physical abuse or torture upon the victim prior to the victim's death, mental anguish, serious physical abuse or torture is inflicted.  Mental anguish is defined as the victim's uncertainty as to his ultimate fate.  Serious physical abuse is defined as physical abuse that creates a substantial risk of death or that causes protracted impairment of health or a loss or protracted impairment of function of any bodily member or organ.  Torture is defined as the infliction of extreme physical pain for a prolonged period of time prior to the victim's death.  A capital murder is committed in an especially depraved manner when the defendant relishes the murder evidencing debasement or perversion or shows an indifference to the suffering of the victim and evidences a sense of pleasure in committing the murder.

That instruction repeated the statutory definitions found in Ark. Code Ann. § 5-4-604(8).  The General Assembly of the State of Arkansas adopted § 5-4-604(8) in response to the decision of the Supreme Court of Arkansas in *Wilson v. State*, 295 Ark. 682, 751 S.W.2d 734 (1998), which held as unconstitutionally vague the aggravating circumstance that the murder was "especially heinous, atrocious, or cruel."  *See Johnson I*, 326 Ark. at 448, 934 S.W.2d at 188.  The Supreme Court of Arkansas has affirmed the constitutionality of § 5-4-604(8) on numerous occasions.  *See id*.

Johnson argues that the decision of the supreme court is an unreasonable interpretation of *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), *Maynard v. Cartwright*, 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988), and *Godfrey v. Georgia*, 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980).  In *Godfrey*, the Court held that the use of the aggravating circumstance that the murder "was outrageously or wantonly vile, horrible or inhuman in that it

28

involved torture, depravity of mind, or an aggravated battery to the victim" was so broad and vague that it violated the Eighth and Fourteenth Amendments to the Constitution of the United States. 446 U.S. at 427-33, 100 S. Ct. at 1764-67. In *Maynard*, the Court held that instructing the jury that it could impose the death penalty because the murder was "especially heinous, atrocious, or cruel" gave no more guidance than the language that was deemed to be insufficient in *Godfrey*. 486 U.S. at 363-64, 108 S. Ct. at 1859. In *Walton*, the Court stated, "It is not a enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face. That is the import of our holdings in *Maynard* and *Godfrey*." 497 U.S. at 653, 110 S. Ct. at 3057. However, the Court recognized that a jury can be given a constitutional remedying definition of an aggravating factor. *Id*. at 653-54, 110 S. Ct. at 3057. Thus, the Court explained:

> When a federal court is asked to review a state court's application of an individual statutory aggravating or mitigating circumstance in a particular case, it must first determine whether the statutory language defining the circumstance is itself too vague to provide any guidance to the sentencer. If so, then the federal court must attempt to determine whether the state courts have further defined the vague terms, and if they have done so, whether those definitions are constitutionally sufficient, *i.e.*, whether they provide *some* guidance to the sentencer. In this case there is no serious argument that Arizona's "especially heinous, cruel or depraved" aggravating factor is not facially vague. But the Arizona Supreme Court has sought to give substance to the operative terms, and we find that its construction meets constitutional requirements.

> The Arizona Supreme Court stated that "a crime is committed in an especially cruel manner when the perpetrator inflicts mental anguish or physical abuse before the victim's death," and that "[m]ental anguish includes a victim's uncertainty as to his ultimate fate."

*Id*. at 654, 110 S. Ct. at 3057-58. The language of the Arkansas statute used in instructing the jury in this case is substantially similar to the language approved in *Walton*, 497 U.S. at 654-55, 110 S. Ct. at 3057-58, as well as the language the Supreme Court declared would be constitutionally sufficient in *Maynard*, 486 U.S. at 364-65, 108 S. Ct. at 1859.

Johnson seems to contend that the evidence was insufficient to show that the murder of Carol Heath was committed in an especially cruel or depraved manner as defined by the Arkansas statute and by the jury instruction given in this case.  That argument is without merit.  There is ample evidence that the murder was committed as a part of a course of conduct intended to inflict mental anguish, serious physical abuse, or torture upon Heath prior to her death, and that mental anguish, serious physical abuse, or torture was inflicted.  Heath's injuries, as described by Dr. Peretti, certainly show that the murderer intended to cause serious physical abuse and did so.

The decision of the Supreme Court of Arkansas is not clearly contrary to nor an unreasonable application of any federal law that has been clearly established by the Supreme Court of the United States.  Johnson's petition for writ of habeas corpus is denied as to his eighth point.

**Claim No. 9:  Johnson received an unfair trial, in violation of the Sixth Amendment cross-section requirement and Fourteenth Amendment due process requirements, by the court  sending the trial to Pike County, instead of Little River County**.[4]

When Johnson was tried for the second time in 1997, he moved for a change of venue because of the extensive publicity that had occurred.  His first trial was conducted in Sevier County, where the murder occurred.  Sevier County is a part of Arkansas's Ninth Judicial Circuit (West), which includes the counties of Howard, Little River, Pike, and Sevier.  The trial judge granted the motion for change of venue and moved the second trial to Pike County.  Johnson then filed a second motion for change of venue and asked that the trial be held in Little River County.

Johnson's argument for moving the second trial to Little River County, instead of Pike County, was based on the racial issues in the case.  Johnson is black; Carol Heath was white.  In arguing for the second motion for change of venue, Johnson's lawyers presented evidence that

---

[4] In Johnson's habeas petition, this claim was erroneously numbered VIII.  In fact, this is his ninth claim.

approximately 3.2% of the eligible voters in Pike County were black, in contrast to Little River

County, where approximately 19% of the eligible voters were black.

In granting the first motion for change of venue, the trial court explained:

Well, having been the trial judge and I remember going through those 90 jurors and read most of the newspaper articles and heard the evidence and know about what it's going to be like next time, maybe – it may be even stronger next time if the police officer from New Mexico is offered the next time. There's a good possibility Mr. Johnson will get the death penalty again. This case will be scrutinized by the federal courts and state courts for years and I don't think there's any reason, other than witnesses having to drive a few more miles, the clerks and other people being put out a little bit, I don't see why there's any reason to not move this to another county and avoid the likelihood in the event of a conviction of having to retry it again, the third time, and just bankrupt the county. I'm going to change the venue to Pike County. That's the furthest county away and they weren't in our district back when all this happened. Nobody knows about it. I wouldn't think that many people would know about it. I don't think the Texarkana Gazette even gets up that way. All they've probably seen is a couple of articles out of the Arkansas Gazette. I think probably it may be a good idea to have future motions over here in Sevier County to avoid any further publicity and make it more convenient for people, too.

In overruling the second motion, when Johnson requested to have the case moved from Pike County

to Little River County, the trial judge explained:

Gentlemen, it's the judgment of this Court that Pike County will be the proper change of venue because there was less publicity about this case in Pike County than any other county in my opinion. That's the main reason for the change of venue because of all the newspaper articles that Mr. Buchanan admitted at the last hearing. It would be more convenient obviously to change it to Little River County where . . . I would be closer and have a secretary and Mr. Buchanan would have his office there and Mr. Cooper, but convenience isn't the main object for a change of venue. The publicity and excessive publicity and getting a fair jury is the main thing and I think we'll be better off leaving it in Pike County, as far as publicity goes.

A number of the articles that created the publicity about this case were published in the

Texarkana Gazette. Texarkana is the county seat of Miller County. Little River County, where

Johnson asked that the case be tried, is adjacent to Miller County. Pike County is the county in the

Ninth Judicial Circuit (West) farthest from Miller County. When Johnson moved for a change of

venue due to the extensive publicity generated by the first trial, it was not unreasonable for the trial

judge to change the venue to the county farthest from the publicity generated by the murder and the first trial.

Johnson cites no case holding that, when the venue of a criminal case is changed, it must be changed to a county with substantial representation of the defendant's race, rather than to a county with little representation of the defendant's race.  The issue would be different if the record showed that the purpose of changing the venue to Pike County was to decrease the representation of blacks on the jury, because "the Constitution prohibits all forms of purposeful racial discrimination in selection of jurors." *Batson v. Kentucky*, 476 U.S. 79, 88, 106 S. Ct. 1712, 1718, 90 L. Ed. 2d 69 (1986).  However, the record here gives no indication of purposeful racial discrimination.  Johnson moved for a change of venue because of pretrial publicity.  That pretrial publicity included articles from a daily newspaper with substantial circulation in the area, the Texarkana Gazette.  The trial judge reasoned that the Texarkana Gazette likely would have greater circulation in Little River County, which is near that newspaper's point of origin, than in Pike County, which is a considerable distance from Texarkana and which, for reasons stated on the record, was unlikely to have been influenced by any publicity surrounding the first trial.  The decision of the Arkansas court was not clearly contrary to nor an unreasonable application of federal law that has been clearly established by the Supreme Court of Arkansas.  *See Mallett v. Bowersox*, 160 F.3d 456, 461 (8th Cir. 1998) ("[W]e decline . . . to infer prejudice solely from the circumstances that the transferring court transferred venue to a county with no black residents (or a very small number of black residents) and the jury ultimately was drawn from that county.").  Johnson's petition for writ of habeas corpus is denied as to his ninth claim.

**Claim No. 10:  The introduction of victim impact evidence violated Johnson's Eighth and Fourteenth Amendment rights.**[5]

At the sentencing phase, the State called three witnesses.  The first was Warren Eckert, a friend of Carol Heath's, who testified that Heath loved her children and was making plans for improving her life.  He also testified, over an objection, regarding Carol Heath's involvement with church during the three years that he knew her.  His testimony on that point was:

> At the beginning we would come and pick them up, but later after about a year or so she decided she would take the church bus which was really an imposition for her because she had to get the kids ready an hour before.  She was the first stop.  And they would have to be picked up at 9:00 and church – Sunday school didn't start until 10:00, but she felt that, you know, she was independent enough to do that and she liked getting the kids ready and they enjoyed Sunday school.  In addition, the last six months she was attending the single adult women Sunday school class and a couple of Sundays the teacher couldn't be there, the main teacher, and so Carol volunteered to substitute.

The State's second witness at the sentencing phase was Carolyn Pullen, the victim witness coordinator for the Ninth Judicial District (West).  She read a victim impact statement from Ashley Heath.  The statement said:

> I loved my mom.  I miss my mom all the time.  I think about my mom.  I'm sad.  It make me cry.  I have bad dreams.  I don't want my birthday in April anymore . . . .[6] Yes [what happened to my mom affected me in school].  It make me slow.  I don't want to be around anybody.  I don't want any friends.  I want to be by myself.

The third witness was John Heath, Carol Heath's father.  He testified regarding how the murder affected his family.

> It's affected us bad.  I still can't get a good night's sleep on account of it and I can't keep from thinking about her.  I think about her every day.  She was my oldest daughter.  I loved her and it hurts when I talk about her or think about her.

---

[5] This claim was numbered IX in Johnson's petition.

[6] Ashley's birthday is April 1, the date that Carol Heath was killed.

It's affected my wife and my daughter, too.  And they feel the same why I do, I imagine.  It hurts.  When I try to discuss it with them, I have to turn and walk off.

Johnson argues that permitting this victim impact testimony was clearly contrary to or an unreasonable application of *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), because the jury was given no instruction regarding how to consider the victim impact testimony and because Heath's religious activities were mentioned.  On the first point, *Payne* affirmed a death sentence in a case in which the trial court had admitted victim impact evidence as well as argument by the prosecutor regarding the impact that the murder had on victims, including the victim's family.  *Id*. at 817-27, 111 S. Ct. at 2604-09.  The reasoning in *Payne* was, in part, that the defendant would be able to put on "'a parade of witnesses [who] may praise the background, character and good deeds of Defendant . . ., without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.'"  *Id*. at 825-26, 111 S. Ct. at 2608-09 (quoting *State v. Payne*, 791 S.W.2d 10, 19 (Tenn. 1990)).  The recitation of facts in *Payne* did not note whether the court instructed the jury as to how it should consider the victim impact evidence, nor does the holding in *Payne* require that any instruction be given to the jury as to how it should consider the victim impact evidence.

Johnson argues that the failure to instruct the jury as to how to consider the victim impact evidence violates not only *Payne*, but also "a legion of cases involving vague statutes giving insufficient guidance to the trier of fact," including *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S. Ct. 618, 83 L. Ed. 888 (1939), and *Papachristou v. City of Jacksonville*, 405 U.S. 156, 92 S. Ct. 839, 31 L. Ed. 2d 110 (1972).  In *Lanzetta*, the Supreme Court held that a statute was unconstitutionally vague when it imposed criminal sanctions on "any person not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any other crime, in this

34

or any other State . . . ."  *Lanzetta*, 306 U.S. at 452-58, 59 S. Ct. at 618-21.  The court noted that there is no definition of "gang" except that it must consist of two or more persons and found the statute to be unconstitutionally vague.  *Id*. at 453-57, 59 S. Ct. at 619-21.  In *Papachristou*, the Supreme Court considered a city ordinance that punished "rogues and vagabonds . . ., common night walkers, thieves, pilferers or pickpockets . . . ."  *Papachristou*, 405 U.S. at 156, 92 S. Ct. at 840.  The Supreme Court held that the ordinance was void for vagueness because it failed to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden.  *Id*. at 162, 92 S. Ct. at 843.

It seems logical that if victim impact evidence is introduced the court should instruct the jury as to how to consider it, but that does not mean that the standard in 28 U.S.C. § 2254(d) has been met.  Neither *Lanzetta*, *Papachristou*, nor any other case that Johnson cites holds or even suggests that a state may not allow victim impact evidence at the sentencing phase of a capital trial unless the jury is instructed as to how to consider the victim impact evidence.  No case cited by Johnson holds that a witness may not mention the decedent's religious activities when testifying at the sentencing phase of a capital case.  The decision of the Arkansas court is not clearly contrary to nor an unreasonable application of any federal law as clearly established by the Supreme Court of the United States.  Johnson's petition for writ of habeas corpus is denied as to his tenth claim.

**Claim No. 11:  The victim impact statute violates the Sixth Amendment right to a jury trial because the jury is not required to make a finding concerning victim impact**.[7]

Johnson's final claim is that clearly established federal law requires that any aggravating circumstance be proven to a jury beyond a reasonable doubt, and that the victim impact process has no provision for that.  For support, he cites *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L.

---

[7] This claim was identified as X in Johnson's petition.

Ed. 2d 556 (2002), which held that the jury, not the judge sitting alone, must determine the presence or absence of an aggravating factor that will determine whether a sentence of death is imposed. He concedes that in *Schriro v. Summerlin*, the court held that *Ring* was not retroactive to cases on collateral review. *Schriro*, 542 U.S. 348, 351-54, 124 S. Ct. 2519, 2522-24, 159 L. Ed. 2d 442 (2004). He argues, however, that *Schriro* does not apply because it discussed the retroactivity of the portion of *Ring* holding that a jury must determine essential facts that determine the defendant's sentence and not a separate portion of *Ring* holding that facts counted as aggravating circumstances must be proven beyond a reasonable doubt.

Johnson apparently refers to the following statement in *Ring*, which was made in the context of a discussion of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000): "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found beyond a reasonable doubt." *Ring*, 536 U.S. at 602, 122 S. Ct. at 2434. Here, the State did not make an increase in the authorized punishment contingent on finding any fact regarding victim impact. Johnson's real argument is not that the jury was instructed that it could find a fact by a standard lower than the reasonable doubt standard; Johnson's real argument is that the jury was given no instruction regarding the victim impact evidence. However, there was not and is not any federal law clearly established by the Supreme Court of the United States requiring that if victim impact evidence is introduced the jury must be instructed as to how to consider that evidence. Johnson's argument on this point is not materially different than his argument in the preceding point, and it fails for the same reasons. Johnson's petition for writ of habeas corpus is denied as to his eleventh claim.

**CONCLUSION**

The Court has reviewed the entire transcript of Johnson's proceedings in the courts of Arkansas and has considered all of the bases for which he argues that a writ of habeas corpus should be issued. Neither Johnson's capital murder conviction nor his death sentence violates the United States Constitution. The decisions of the courts of Arkansas in this case are not clearly contrary to nor an unreasonable application of federal law as clearly established by the Supreme Court of the United States. Johnson's petition for writ of habeas corpus is denied in its entirety.

IT IS SO ORDERED this 14th day of August, 2007.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE